**Alyce M. KWASNY, administrator of the estate of William C. Kwasny, deceased, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 86–2694.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1987.

Decided July 13, 1987.

Linda A. Wawzenski, Asst. U.S. Atty., Chicago, Ill., for defendant-appellant.

Michael L. Bolos, Michael L. Bolos, Ltd., Chicago, Ill., for plaintiff-appellee.

Before WOOD, POSNER, and MANION, Circuit Judges.

POSNER, Circuit Judge.

This suit for wrongful death, brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, charges that William Kwasny's death was due to negligence by doctors employed at a hospital owned by the Veterans Administration. The district judge found negligence and awarded damages of $485,215. The

government appeals, complaining about both the finding of liability and the size of the damage award, which, the government argues, should not exceed $100,000.

A veteran of World War II, Kwasny contracted rheumatoid arthritis in 1945, when he was 30 years old. This is a chronic, crippling, incurable disease. It is sometimes virulent, and was in Kwasny's case. By 1978, when he was 63, his spine and knees were frozen in a bent position, he was confined to a wheelchair, and for the last 10 years he had been unable to work. Despite his disability he made recordings for the blind as a community service.

He had had many operations, the most recent one in 1976, and in all of these he had been operated on while under a general anesthetic. On one occasion he had explicitly refused to have a spinal anesthetic instead. In 1978 he was admitted to the hospital for another operation, this one on a knee. The doctors were concerned that it might be difficult to "intubate" Kwasny, i.e., to insert a tube in his windpipe through which oxygen would be pumped while he was anesthetized (a general anesthetic paralyzes the lungs). One doctor suggested a spinal anesthetic, but Kwasny refused; he wanted a general anesthetic, as he had always had. But he was heavily medicated when he made this decision, so it may not have been well considered.

Before the general anesthetic was administered, Kwasny was put into a light sleep (one in which he would still be breathing under his own power). The next step was to "preoxygenate" Kwasny, that is, fill his lungs with oxygen, so that he would not be deprived of oxygen during the few minutes occupied by the next stage of the procedure. That stage begins with the administration of a muscle relaxant that causes the patient to stop breathing. The doctors then "intubate" the patient, which means inserting a tube through the mouth (or nose) and down the trachea. When intubation is complete the breathing machine is switched on and the general anesthetic is administered. See 3 Gray & Gordy, Attorneys' Textbook of Medicine ¶¶ 58.80–58.-81(2) (3d ed. 1986).

At first the doctors tried to intubate Kwasny through the mouth (the normal procedure). His neck was so bent that they had to apply considerable force with the intubating instrument (a laryngoscope), causing his lip to be lacerated and a tooth to be loosened. Even so they were unable to effect an intubation. They then tried to intubate him through his nose; this worked easily, and they then gave him the general anesthetic and performed the operation without incident.

When Kwasny awoke after the operation, he complained of difficulty in swallowing. The next day the tissues of his neck swelled. Two days later he suffered an arrest of breathing and an emergency tracheotomy was performed. He appeared to recover, and was discharged from the hospital, but continued to complain about his throat. Six months later he suffered an acute respiratory arrest, was hospitalized, went downhill rapidly, and died. The death certificate lists many causes of death, including acute respiratory failure, airway obstruction, kidney failure, and rheumatoid arthritis. The plaintiff's theory of the case, in support of which expert medical testimony was presented and which the district judge accepted, was that the initial attempt to intubate Kwasny during his last operation had been negligent and had perforated his windpipe and that the perforation had led ultimately to his death. The government presented contrary evidence on both negligence and causation.

■ The government points out correctly that the district judge's findings contain factual errors and that its expert witnesses were more experienced than the plaintiff's. There is no need to take up space in the *Federal Reporter* to rehearse these purely factual and evidentiary disputes. Suffice it to say that there is enough evidence to support the judge's conclusions and that his findings, while probably erroneous in some respects, do not reflect so fundamental or pervasive a confusion as to invalidate his conclusions. An error that would not (if corrected in time) have altered the judge's conclusion is a harmless error, and therefore not a ground for reversal. See Fed.R.Civ.P. 61; *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1467–68 (11th Cir.1985); *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 626 (4th Cir. 1979). The government has never explained why its doctors thought it necessary—in what it concedes and indeed emphasizes was elective surgery, and given the possibility of nasal intubation—to use such force in trying to push a tube through the windpipe of this frail and badly crippled man that they lacerated his lip, loosened a tooth, and, more seriously, may have perforated his trachea; and while the causality of his death is by no means certain, uncertainty cannot by itself justify reversing a judgment of liability.

■ The general tendency of courts in tort cases, once negligence is established, is to resolve doubts about causation, within reason, in the plaintiff's favor. See Prosser and Keeton on the Law of Torts § 41, at p. 270 (5th ed. 1984); 4 Harper, James & Gray, The Law of Torts § 20.2, at pp. 92–93, 97 (2d ed. 1986). Kwasny cannot invoke this principle, because the Illinois cases do not support it. See, e.g., *McInturff v. Chicago Title & Trust Co.*, 102 Ill.App.2d 39, 243 N.E.2d 657 (1968). But they do support the proposition that the factfinder's resolution of the issue of causation will be given particular deference. See, e.g., *Estock v. Tri-Rental Co.*, 122 Ill.App.3d 1074, 1077, 78 Ill.Dec. 814, 816, 462 N.E.2d 933, 935 (1984) (dictum). However skeptical we might be as an original matter, we cannot gainsay the presence in the record of adequate medical evidence not only that the brutally forced tube perforated Kwasny's windpipe but also that the perforation caused his death in the sense that, but for the windpipe's being perforated, he would not have died when he did. Nothing more is required to place the district court's finding of causation beyond our legitimate power to revise. That a younger and more robust person would not have been fatally injured by the botched intubation is irrelevant; the tortfeasor takes his victim as he finds him. *Balestri v. Terminal Freight Coop. Ass'n*, 76 Ill.2d 451, 455–56, 31 Ill.Dec. 189, 191, 394 N.E.2d 391, 393 (1979).

The troublesome issue in the case is the amount of the damage award—almost $500,000. At issue is $100,000 for loss of consortium, awarded to Mrs. Kwasny, and $350,000 for pain and suffering (including deprivation of the utility he derived from reading to the blind) suffered by Mr. Kwasny before he died. The government, which contends that the maximum reasonable award for both loss of consortium and pain and suffering should be less than $65,000, comes close to arguing that given Mr. Kwasny's miserable physical state the hospital did him and his wife a favor by shortening his life. It is of course true that some people, especially people who suffer from chronic disabling illnesses, derive little positive utility from life, and sometimes no or even negative utility; suicide by sane people would be inexplicable otherwise. But it cannot be presumed that because a person is crippled and aged, as Mr. Kwasny was, he derives no benefits from living, and (more important as we shall see) confers none on those he lives with. It is a question for the trier of fact whether these things are so or not. The district judge heard the testimony of Mrs. Kwasny and their daughter. He heard Mrs. Kwasny testify to how much she missed her husband. He heard her and her daughter testify about the pleasure that Mr. Kwasny derived from recording books for the blind. He heard testimony about the pain and suffering that Kwasny suffered in his last illness.

In light of the trial judge's superior ability to gauge the credibility of the witnesses and to make necessarily subjective assessments of intangible loss, we have no basis for disturbing his award of $100,000 for loss of consortium. But we think $350,000 for pain and suffering was clearly excessive, and must be reduced. Illinois (whose substantive law governs this case) does not permit recovery in a wrongful death suit of the loss of utility to the decedent from having his life cut short; the only thing that can be recovered is the pecuniary loss to the survivors. Ill.Rev. Stat. ch. 70, ¶¶ 1–2. It is true that the decedent's own suit for personal injury survives his death, see Ill.Rev.Stat. ch. 110½,

¶ 27–6, but such a suit, at least as conventionally conceived, is a suit for the loss sustained by him during his lifetime, and not for the loss of utility from dying prematurely. The qualification is important. In another federal tort claims case governed by Illinois law, the government conceded, despite the absence of any case authority in Illinois, that a reduction in life expectancy is compensable upon proper proof. See *DePass v. United States*, 721 F.2d 203, 208 (7th Cir.1983) (dissenting opinion). But the plaintiff in this case did not seek, and the district court did not award, any damages on the basis of such a theory. It is therefore irrelevant to our consideration of the reasonableness of the damages that Mr. Kwasny, despite his radically impaired health and mobility, might have derived positive utility from the years that were denied him as a result of the government's negligence. The only relevant cost is the pain and suffering that he experienced as a result of that negligence. As the government points out, he was unconscious throughout most of his last illness, and before then his suffering from the botched intubation had been limited to minor problems with swallowing and hoarseness, plus the episode of respiratory arrest and the ensuing tracheotomy and convalescence therefrom. The cumulative pain and discomfort were not trivial but the award of $350,000 to compensate for them was in our view "manifestly erroneous." *Lynch v. Precision Machine Shop, Ltd.*, 93 Ill.2d 266, 278, 66 Ill.Dec. 643, 649, 443 N.E.2d 569, 575 (1982).

We disagree with those students of tort law who believe that pain and suffering are not real costs and should not be allowable items of damages in a tort suit. No one likes pain and suffering and most people would pay a good deal of money to be free from them. If they were not recoverable in damages, the cost of negligence would be less to the tortfeasors and there would be more negligence, more accidents, more pain and suffering, and hence higher social costs. But there is a justified public concern with extravagant tort awards, and it is a duty of an appellate court to keep

these awards within reason. We think $175,000 is the highest reasonable estimate of Mr. Kwasny's pain and suffering due to the government's negligence. We order the judgment of the district court modified accordingly, and as modified the judgment is

AFFIRMED.