CENTER VIDEO INDUSTRIAL
COMPANY, INCORPORATED,
Plaintiff–Appellant,

v.

UNITED MEDIA, INCORPORATED,
Defendant–Appellee.

No. 92–1560.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1992.

Decided June 8, 1993.

David Ward (argued), Ward & Metti, Chicago, IL, for plaintiff-appellant.

David Bayless (argued), Christopher M. Murphy, McDermott, Will & Emery, Chicago, IL, Eugene J. Albertini, Keith Davis, Albertini & Gill, Los Angeles, CA, for defendant-appellee.

Before RIPPLE and ROVNER, Circuit Judges, and ENGEL, Senior Circuit Judge.*

ENGEL, Senior Circuit Judge.

This appeal requires us to measure the facts pleaded to establish a vertical price-fixing conspiracy in violation of section 1 of the Sherman Act against the standards of *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Although the specific language employed by the district court does not entirely conform to the standards in *Business Electronics,* we affirm its grant of summary judgment to the defendant, concluding that any such error was harmless on the undisputed facts here.

## I.

Defendant-appellee United Media manufactures commercial quality video tape editing equipment and distributes it nationally through a network of full-service and discount dealers. Typically, full-service dealers charge a relatively high price for the equipment, but they offer services such as demonstrations, repairs, and loaner equipment. Discount dealers, on the other hand, generally offer no such services, and are for that reason able to charge a lower price for the equipment. At the commencement of the time period relevant to this case, early 1990,

* Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

United Media sold its equipment through three discount dealers: Discount Video,[1] Walt Davis Enterprises, and plaintiff-appellant Center Video.

In early April, a Discount Video executive complained to United Media's marketing director about competition from Center Video, claiming that Center Video was undercutting Discount Video in the discount market. In response to this complaint, United Media's marketing director telephoned Center Video's sales manager to discuss Center Video's pricing strategy. In May, before these discussions were able to achieve a resolution of the issue, Discount Video suspended its sales of United Media products. In June, United Media's marketing director met with Discount Video's president and on another occasion with Center Video's sales manager. During the latter meeting, United Media's marketing director reiterated his concerns. He urged Center Video's sales manager to raise the company's prices for United Media products, but the sales manager refused.

In July, United Media's marketing director informed Center Video's sales manager that United Media would no longer sell its products to Center Video.[2] United Media then informed Discount Video of this action. Within a week, Discount Video began once again to purchase United Media equipment. When Discount Video resumed sales of United Media products, the prices it charged for those products were higher than the prices that it was charging while in competition with Center Video. For example, while Discount Video had previously sold United Media's UM430 basic edit controller at prices ranging from $2,730 to $3,007 per unit, the dealer's prices for the same unit after United Media's termination of Center Video ranged from $3,068 to $3,479 per unit.

In response to United Media's cessation of sales to Center Video, Center Video filed suit alleging, *inter alia*, breach of contract and violation of section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits contracts, combinations, and conspiracies in restraint of trade. The district court dismissed the count alleging breach of contract and a count alleging violation of an Illinois consumer law, and it entered summary judgment for United Media on the count alleging violation of the Sherman Act. In so ruling, the district court, relying on *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 726–27, 108 S.Ct. 1515, 1520–21, 99 L.Ed.2d 808 (1988), stated that "an agreement between a manufacturer and dealer to terminate another dealer because it is a price cutter is insufficient to establish an antitrust violation. The manufacturer and dealer must also have agreed on the resale price that the dealer is to charge its customers." *Center Video Industrial Co. v. United Media, Inc.*, No. 90 C 6387, Mem.Op. at 4–5, 1992 WL 27006 (N.D.Ill. Feb. 7, 1992).

Center Video appeals. After a review of the district court's grant of summary judgment *de novo*, *Bostic v. City of Chicago*, 981 F.2d 965, 967 (7th Cir.1992), we affirm. FED. R.CIV.P. 56(c).

## II.

In *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), the Supreme Court addressed the evidentiary showing necessary to establish a *per se* violation of section 1 of the Sherman Act in the context of vertical restraints. Business Electronics was one of two retailers of Sharp products in the Houston area. The other retailer, after complaining repeatedly to Sharp about competition from Business Electronics, informed Sharp that it would cease purchasing Sharp products unless Sharp ended its relationship with Business Electronics. When Sharp took the requested action, Business Electronics brought suit alleging a violation of section 1 of the Sherman Act. The trial court instructed the jury that "[t]he Sherman Act is violated when a seller enters into an agreement or understanding with one of its dealers to terminate another dealer because of the other dealer's price cutting." So instructed, the jury found for Business Electronics. The Fifth Circuit reversed, and the Supreme Court affirmed the reversal.

---

1. Discount Video was a wholly owned subsidiary of a full-service dealer.

2. United Media also terminated its relationship with Walt Davis in July.

The Supreme Court began its analysis by noting that, ordinarily, alleged violations of the Sherman Act are judged under the rule of reason, under which the finder of fact examines all of the circumstances of a case in order to determine whether the restrictive practice at issue imposes an unreasonable restraint on competition. *Id.* at 723, 108 S.Ct. at 1518 (citing *Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)). The Court then noted that an exception to the general rule applied to types of conduct that are so manifestly anti-competitive as always or almost always to restrict competition and decrease output. *Id.* (citing *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289–290, 105 S.Ct. 2613, 2616–2617, 86 L.Ed.2d 202 (1985); *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–1563, 60 L.Ed.2d 1 (1979)). When a restrictive practice falls within this exception, courts will rule that practice *per se* illegal under the Sherman Act, without engaging in a thorough inquiry into the practice's anti-competitive effects. The Court cautioned, however, that the range of conduct subject to analysis under the *per se* rule is narrow and that, particularly in actions alleging the existence of vertical restraints, "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." *Id.*, 485 U.S. at 724, 108 S.Ct. at 1519 (quoting *GTE Sylvania*, 433 U.S. at 58–59, 97 S.Ct. at 2562).

The Supreme Court then addressed the question whether agreements such as that effectively condemned by the trial court's jury instructions—agreements to terminate a dealer because of price cutting—had been shown to produce the requisite "demonstrable economic effect." The Court ruled that they had not, concluding that, in the absence of market power, competition from other brands would always ensure that any given manufacturer's retail sales price would not rise above the competitive level. *Id.*, 485 U.S. at 725, 108 S.Ct. at 1520 (citing *GTE Sylvania*, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19). In the Court's view, only one legitimate justification existed for prohibiting vertical price restraints imposed by manufacturers who lack significant market power: a proved tendency for such agreements to facilitate the formation of horizontal cartels. *See Sharp Electronics*, 485 U.S. at 725, 108 S.Ct. at 1520; *GTE Sylvania*, 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18; *White Motor Co. v. United States*, 372 U.S. 253, 268, 83 S.Ct. 696, 704, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring).[3]

The Court suggested two mechanisms by which vertical price maintenance agreements might be used to facilitate the formation of horizontal cartels. The first such mechanism facilitates cartelization at the retail level. Under this view, competing retailers who desire to enter into a cartel are prevented from doing so only by the absence of a mechanism by which they can enforce the agreement against wayward members of the conspiracy. In these circumstances, the theory posits, the retailers turn to the manufacturer for assistance. The retailers inform the manufacturer that, unless it imposes vertical price restraints on the prospective cartel members, they will stop purchasing its products. In this way, the retailers foist resale price maintenance agreements onto unwilling manufacturers. Accordingly, the theory has it, prohibiting resale price maintenance agreements denies to potential retail-level cartels the only effective enforcement mechanism available to them. *See Sharp Electronics*, 485 U.S. at 725–26, 108 S.Ct. at 1520–21; *GTE Sylvania*, 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18.[4]

---

3. *See also* Richard Posner, *Antitrust Policy and The Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions*, 75 COLUM.L.REV. 294, 298 (1975); *Note, Vertical Territorial and Customer Restrictions in the Franchising Industry*, 10 COLUM.J.L. & SOC.PROB. 497, 498 (1974); RICHARD POSNER, ANTITRUST: CASES, ECONOMIC NOTES AND OTHER MATERIALS 134 (1974); ERNEST GELHORN, ANTITRUST LAW AND ECONOMICS 252 (1976).

4. *See also* POSNER, ANTITRUST, *supra*, at 134; Thomas A. Piraino, Jr., *The Case for Presuming the Legality of Quality Motivated Restriction on Distribution*, 63 NOTRE DAME L.REV. 1, 14 (1988); Barbara Ann White, *Black and White Thinking in*

Vertical price maintenance agreements may also assist in the formation of cartels at the manufacturer level. Under this view, manufacturers may desire to enter into agreements with one another governing the prices that they may charge their retailers. Since those prices are not typically available to the public, such prospective cartel members lack an effective method of determining whether their partners are abiding by the rules of the cartel. Accordingly, the theory has it, such manufacturers would agree to impose price restraints upon their retailers. The members of the cartel then need only monitor the retail prices of their partners' distributors, secure in the knowledge that any deviation from a given retail price would indicate that a member of the cartel had broken ranks and was selling the product to its distributors at a price lower than that to which the cartel members had agreed. *See Sharp Electronics*, 485 U.S. at 724, 108 S.Ct. at 1519; *GTE Sylvania*, 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18.[5]

Not all vertical restraints, however, facilitate the formation of horizontal cartels in the manners described above. Only vertical restrictions that dictate prices with a certain amount of specificity can be used to police a manufacturer-level cartel or to enforce a retail-level cartel:

> There has been no showing here that an agreement between a manufacturer and a

dealer to terminate a "price cutter," without a further agreement on the price or price levels to be charged by the remaining dealer, almost always tends to restrict competition and reduce output. Any assistance to cartelizing that such an agreement might provide cannot be distinguished from the sort of minimal assistance that might be provided by vertical non-price agreements like the exclusive territory agreement [condoned] in *GTE Sylvania*, and is insufficient to justify a *per se* rule. Cartels are neither easy to form nor easy to maintain. Uncertainty over the terms of the cartel, particularly the prices to be charged in the future, obstructs both formation and adherence by making cheating easier. Without an agreement with the remaining dealer on price, the manufacturer both retains its incentive to cheat on any manufacturer-level cartel, since lower prices can still be passed on to consumers, and cannot as easily be used to organize and hold together a retailer-level cartel.

*Sharp Electronics*, 485 U.S. at 726–27, 108 S.Ct. at 1520 (citations and footnote omitted). Accordingly, the Court ruled that "a vertical restraint is not illegal *per se* unless it includes some agreement on price *or price levels*." *Id.* at 735–36, 108 S.Ct. at 1525 (emphasis added).

---

*the Gray Areas of Antitrust: The Dismantling of Vertical Restraints Regulation*, 60 GEO.WASH. L.REV. 1, 42 (1991).

There are, however, several problems with this theory. First, for the retailers' scheme to be successful, it must include not only all of the retailers of the products of a given manufacturer in a given market, but also all of the manufacturers who sell their products in that market. Otherwise, any attempt to raise the retail price of a given manufacturer's products to monopoly levels will simply drive customers to the products of competing manufacturers. *See* Baker, *Interconnected Problems of Doctrine and Economics in the Section 1 Labyrinth: Is Sylvania a Way Out?*, 67 VA.L.REV. 1457, 1489 (1981); Jean Wegman Burns, *The New Role of Coercion in Antitrust*, 60 FORDHAM L.REV. 379, 397 (1991). Second, there must be barriers to entry at the retail level. Otherwise, any manufacturer unwilling to sell its products at monopoly prices will simply find another retailer. *See id.*; Frank Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 ANTITRUST L.J. 135, 141–43 (1984). Finally, commentators have observed that any retail-level cartel extensive enough to be successful will be readily identifiable. Thus, such cartels "easily can be attacked directly as *per se* illegal horizontal agreements." Thomas A. Piraino, Jr., *Sharp Dealing: The Horizontal/Vertical Dichotomy in Distributor Termination Cases*, 38 EMORY L.J. 311, 318 n. 27 (1989).

5. *See also* Piraino, Jr., *Quality Motivated Restrictions*, 63 NOTRE DAME L.REV. at 14; White, *supra*, 60 GEO.WASH.L.REV. at 41.

This theory, too, is subject to criticism. First, as is the case with any horizontal agreement, success depends upon the participation of virtually all manufacturers and on barriers to entry in the relevant industry. *See* William Baxter, *The Viability of Vertical Restraints Doctrine*, 75 CAL-IF.L.REV. 933, 942 (1987); Burns, *supra*, 60 FORD-HAM L.REV. at 395. Additionally, as with retail level cartels, any manufacturer-level cartel pervasive enough to be successful will likely be readily identifiable, and can be attacked directly as a *per se* violation of the Sherman Act. *See* n. 2, *supra*.

Here, Center Video has conceded that it could find no evidence of an agreement between United Media and Discount Video to set a specific retail price or to maintain retail prices within a specific range. Indeed, the fluctuation of Discount Video's prices after United Media's termination of Center Video strongly suggests that no such agreement exists. While it might be argued that Discount Video's prices were actually the result of a complex agreement designed to avoid detection, such an intricate arrangement would not tend to facilitate cartelization any more than would a non-price restriction. Accordingly, allegations of the existence of such a detailed arrangement would not suffice to render the agreement *per se* unreasonable under the Sherman Act.

Center Video makes much of the district court's seeming requirement that any vertical restraint, to be *per se* illegal, must be one to set a specific price. It points out that the district court ruled that "[t]he manufacturer and dealer must also have agreed on the resale price that the dealer is to charge its customers." Mem.Op. at 4–5. This sentence indicates that the district court was imposing on Center Video a requirement more stringent than that set forth in *Sharp Electronics,* where the Court stated that an agreement on "price, or *price levels*" would be sufficient to establish a *per se* violation of the Sherman Act. 485 U.S. at 736, 108 S.Ct. at 1525 (emphasis added). Center Video argues that the district court's ruling constitutes reversible error.

We agree that the district court's requirement that Center Video allege the existence of an agreement to set a specific price is inaccurate. We decline, however, to reverse on that account. Federal Rule of Civil Procedure 61 counsels a court to leave undisturbed any erroneous ruling that does not "affect the substantial rights of the parties." As we held in *Kwasny v. United States,* 823 F.2d 194, 196 (7th Cir.1987), "[a]n error that would not (if corrected in time) have altered the judge's conclusion is a harmless error, and therefore not a ground for reversal." *See also TMF Tool Co. v. Siebengartner,* 899 F.2d 584, 588 n. 4 (7th Cir.1990).

Here, Center Video has failed to allege facts tending to show the existence of an agreement to set even price levels, let alone specific prices.[6] It thus has failed to indicate how it could have succeeded even under the more liberal standard.

We find instructive the following words of the Federal Circuit:

> This court reviews judgments, not phrases. To be relevant on appeal, phrases in a trial court's opinion must be shown not only to have been used in error, but ·... to have served as the basis of the judgment appealed from.

*Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1572 (Fed.Cir.1986) (citation omitted). Any error in stating the legal rule is therefore harmless.[7]

AFFIRMED.

---

6. We note also that a restraint requiring retailers to set prices within a certain range above the competitive level will likely appear no different from a restraint setting a specific price, because any retailer constrained to set a price within a range above the competitive level will set its price as low as the constraint allows in order to maximize revenue. For example, if a pencil seller who had previously maximized his revenue by charging a dime were forced to charge somewhere between 25 and 50 cents, he would charge a quarter, and no more.

7. Center Video previously moved this court to strike portions of United Media's brief. By order dated June 17, this court denied that motion. United Media has similarly moved to strike portions of Center Video's reply brief. As this court did not consider relevant the portions of Center Video's reply brief to which United Media objects, the motion is moot.