Raymond ROSEN, Plaintiff–Appellant,

v.

**CIBA–GEIGY CORPORATION,**
**Defendant–Appellee.**

No. 95–3064.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1996.

Decided March 11, 1996.

Michael Resis (argued), Paul Sarauskas, Querrey & Harrow, Chicago, IL, for plaintiff-appellant.

Anne G. Kimball (argued), Kevin B. Reid, Elizabeth A. Sanders, Wildman, Harrold, Allen & Dixon, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, and CUMMINGS and BAUER, Circuit Judges.

POSNER, Chief Judge.

The defendant, Ciba–Geigy, manufactures a nicotine patch called "Habitrol." The patch is affixed to the user's skin and delivers nicotine through the skin and into the bloodstream. The goal is to help the user break his cigarette habit by alleviating his craving for nicotine. The patch is available only by prescription. The instructions that accompany the patch warn both the physician and the patient that the patient should not smoke while wearing the patch and that a patient who has coronary artery disease should be carefully screened before the patch is prescribed for him. The plaintiff, Rosen, a heavy smoker all his adult life, had his first heart attack in 1987, followed by quadruple bypass surgery. He was told to stop smoking, but did not. He experienced chest pains and other cardiac symptoms in the following years, indicating a progression of his coronary artery disease. His previous heart attack, high blood pressure, cholesterol count, age (60 in 1992), and continued smoking placed him at high risk of having another heart attack.

In June of 1992 the cardiologist who was treating Rosen, Dr. Car, prescribed the Habitrol patch and told him not to smoke while wearing it. Rosen affixed the patch to his arm but continued smoking, as, we are told, 75 percent of patch wearers do. Upon awakening on the morning of the third day of wearing the patch, Rosen smoked two cigarettes and then took a bath. During the bath he removed the patch and immediately felt a numbing sensation in the same arm. Later that morning he experienced discomfort in his chest, went to the hospital, and was diagnosed as having had another heart attack. He later resumed smoking and has since had two more heart attacks.

This diversity suit claims that Ciba–Geigy was negligent in developing, marketing, and selling the Habitrol patch. What exactly the negligence is believed to consist in is unclear. It is also unclear why the plaintiff has pleaded negligence rather than, as is usual in a products case, strict liability—though in a case, such as this, involving an alleged defect in the conception or design rather than manufacture of a product, there may be no difference. *Bammerlin v. Navistar Int'l Transportation Corp.*, 30 F.3d 898, 902 (7th Cir. 1994); *Flaminio v. Honda Motor Co., Ltd.*, 733 F.2d 463, 467 (7th Cir.1984). The suit was dismissed on summary judgment for want of an adequate showing of a causal connection between the patch and the heart attack, so the issue of the defendant's alleged

breach of its duty of care was not explored. The plaintiff seems to believe either that the warnings of possible harm to people with coronary artery disease are inadequate or that the product is unreasonably dangerous, perhaps because the product is sold to addicts who can be expected to disregard any warnings. For purposes of this appeal we accept these beliefs, without of course vouching for their validity.

When an unusual event follows closely on the heels of another unusual event, the ordinary person infers a causal relation; so it was natural for Mr. Rosen to assume that the heart attack he experienced in June of 1992 was caused either by wearing or removing the patch. The inference is reinforced by the fact that nicotine is a principal ingredient of cigarette smoke, which is known to be a cause of coronary artery disease, and by the fact that the manufacturer of the patch had warned that it might have bad effects on persons who already have the disease. But lay speculations on medical causality, however plausible, are a perilous basis for inferring causality; and though Rosen refers to newspaper accounts of "an epidemic of heart attacks to patch users who smoked" while wearing the patch, we do not understand him to be quarreling with the proposition that without scientific evidence of a causal relation between the nicotine patch and his heart attack, as distinct from journalistic reports, he cannot prevail in this suit.

Rosen relied for his scientific evidence on the deposition of Dr. Harry Fozzard, a distinguished cardiologist and department head at the University of Chicago. Despite Fozzard's sterling credentials, the district judge ruled that his opinion concerning the role of the nicotine patch in Rosen's heart attack would not be admissible in evidence; and without that evidence Rosen's case was doomed. The judge also thought that Rosen could not prove causality because Fozzard said that the probability that Rosen would have had a heart attack anyway, nicotine patch or no, was 95 percent. But Fozzard did not say when that almost inevitable heart attack would have occurred; and the loss of even a small chance of averting a serious harm may be compensable under Illinois law

(here applicable), as we noted recently in *Murrey v. United States,* 73 F.3d 1448, 1453–54 (7th Cir.1996); see also *Doll v. Brown,* 75 F.3d 1200, 1205–06 (7th Cir.1996).

So the district judge's decision can be sustained only if his ruling on the admissibility of Fozzard's evidence is upheld. Under the regime of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist. As Judge Kozinski has emphasized in his opinion on remand from the Supreme Court's decision in *Daubert,* it is a daunting task for judges who do not have a scientific background (and most do not) to decide whether a scientist's testimony is real science or not. 43 F.3d 1311, 1315–16 (9th Cir.1995). But they must do the best they can, and we think the district judge was right (and certainly acting within the scope of his discretion) in concluding that Dr. Fozzard's testimony was not real science.

To reach this conclusion we do not have to become philosophers of science and set forth the necessary and sufficient conditions of "real" science. When the Supreme Court in *Daubert* told judges to distinguish between real and courtroom science, it was not with the object of discovering the essence of "science," if there is such an essence. The object, we think, while conceding the uncertainty concerning the reach of the majority opinion discussed in the Chief Justice's separate opinion, 509 U.S. at ——, 113 S.Ct. at 2799, was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work. Cf. 509 U.S. at —— — ——, 113 S.Ct. at 2796–97; *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106–07 (7th Cir.1994). If they do, their evidence (provided of course that it is relevant to some issue in the case) is admissible even if the particular methods they have used in arriving at their opinion are not yet accepted as canonical in their branch of the scientific community. If they do not, their evidence is inadmissible no mat-

ter how imposing their credentials. Regarding the second half of this test, the half involved in this case, we said before (but consistently with) *Daubert* that "an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.... Professor Bryan would not accept from his students or those who submit papers to his journal an essay containing neither facts nor reasons; why should a court rely on the sort of exposition the scholar would not tolerate in his professional life?" *Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989).

■ Dr. Fozzard's deposition, while expressing what may be an insightful, even an inspired, hunch concerning the cause of the heart attack that Rosen experienced in June of 1992, lacks scientific rigor. The deposition offers neither a theoretical reason to believe that wearing a nicotine patch for three days, or removing it after three days, could precipitate a heart attack, or any experimental, statistical, or other scientific data from which such a causal relation might be inferred or which might be used to test a hypothesis founded on theory. The usual kind of heart attack, and the kind that Rosen has now had several times, is a myocardial infarction, which is a sudden, drastic reduction in the flow of blood to the heart as a result of plaque breaking loose from the walls of a coronary artery and forming a clot that blocks the artery. That smoking cigarettes can contribute to the formation of plaque and so play a causal role in heart attacks is now very generally accepted. Whether nicotine, which is only one ingredient of cigarette smoke, can have that effect is much less clear, despite Ciba–Geigy's warnings, which could, though required by the Food and Drug Administration, be overcautious. But let us assume that nicotine can contribute to the formation of plaque. Fozzard mentioned a study of dogs which found this; and though an automatic extrapolation from dogs to human beings would not be warranted, animal studies play an important role in human medical research. Missing from Fozzard's deposition, however, is any recognition of the distinction between the short-run and long-run effects of smoking, fatty diet, high blood pressure, diabetes, and the other well-known causal factors in coronary artery disease and hence in heart attacks. Wearing a nicotine patch for three days, like smoking for three days, is not going to have a significant long-run effect on coronary artery disease; that much is clear. In the long, gradual progression of Rosen's coronary artery disease those three days were a blink of the eye. The patch could have had no significance for Rosen's health, therefore, unless it precipitated his heart attack in June of 1992. That is an entirely different question from whether nicotine, or cigarettes, are bad for one's arteries.

We are baffled by Fozzard's failure to make this elementary distinction. Shoveling snow can precipitate a heart attack, but it cannot cause coronary artery disease. Eating an omelette every day can (in combination with a genetic or other abnormality that prevents the body from properly regulating the level of cholesterol in the blood) cause coronary artery disease; but eating an omelette three days in a row is exceedingly unlikely to precipitate a heart attack. Quitting smoking is, by inducing stress, more likely to precipitate a heart attack than smoking one more cigarette is likely to do. In this example an event has opposite short-run and long-run consequences for heart attacks—increasing the short-run likelihood and reducing the long-run likelihood. Exercise is a similar example. Nowhere in Fozzard's deposition is there an explanation of how a nicotine overdose (for remember that Rosen was smoking at the same time that he was wearing the patch) can precipitate a heart attack, or a reference to a medical or other scientific literature in which such an effect of nicotine is identified and tested. Since Fozzard is a distinguished cardiologist, his conjecture that nicotine can have this effect and may well have had it on Rosen is worthy of careful attention, even though he has not himself done research on the effects of nicotine. But the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it. There may be evidence to back up Fozzard's claim, but none was presented to the district court.

■ Dr. Car's deposition hints that a nicotine overdose might cause an arterial spasm that might in turn cause an infarct. But again no backing from scientific theory or data was offered. There is also no evidence concerning the level of nicotine in Rosen's blood when he had the infarct and Car's own conclusion was that the patch had not caused Rosen's heart attack—a conclusion that Rosen does not like, so he calls Car's deposition "waffling" and says that in it Car "several times made contradictory statements." The district court was within its discretion in concluding that the scientific evidence of causation that the plaintiff offered was not admissible, and therefore in dismissing the suit.

The plaintiff also argues that the district judge taxed "exorbitant" costs, in particular $1,400 for copies, which the plaintiffs calls "outrageous." The plaintiff has made no effort to substantiate these accusations, and we reject them.

AFFIRMED.