**Lillian E. AWAD, Plaintiff,**

**v.**

**MERCK & CO., INC., Defendant.**

**No. 95 Civ. 8779(LLS).**

United States District Court, S.D. New York.

Aug. 31, 1999.

Godosky & Gentile, P.C., New York City, Anthony P. Gentile, of counsel, for Plaintiff.

Baker & Botts, L.L.P., Houston, TX, Richard L. Josephson, of counsel, for Defendant.

**OPINION AND ORDER**

STANTON, District Judge.

Lillian Awad sues Merck & Co., Inc. ("Merck"), claiming that Merck's rubella vaccination caused her permanent arthritis

and arthralgia. Merck moves for summary judgment, arguing that since plaintiff's experts' testimony and reports lack scientific credibility and are thus inadmissible under Fed.R.Evid. 702 and 703, plaintiff cannot prove causation. In addition, Merck argues that it is entitled to summary judgment under the National Childhood Vaccine Injury Compensation Act, 42 U.S.C. § 300aa–1 *et seq.* ("Vaccine Act").

## BACKGROUND

Meruvax II is Merck's brand name for the RA 27/3 vaccine for immunization against rubella. RA 27/3 was approved by the FDA in 1978 and has been marketed in the United States since 1979. On July 6, 1989, Awad received a Meruvax II vaccination, which her job as a nurse required. Within six to ten days, she developed joint pains, swelling, and tenderness which, according to Awad, have not subsided.

Ms. Awad claims that her medical condition is permanent and that it was caused by the vaccine. Merck states that while RA 27/3 may cause short-term arthritis or arthralgia, no reliable evidence shows that it causes chronic or permanent joint pain; on the contrary, large-scale epidemiological studies suggest that the vaccination poses no risk of permanent joint problems. Merck argues that plaintiff's experts' opinions rest on scientifically inadequate bases such as the temporal relationship between Awad's vaccination and the onset of her joint pain and the potential relationship between rubella vaccines and chronic arthritis, which Merek says Awad has never been diagnosed as having.

Finally, Merck claims that the warnings on the package insert of the RA 27/3 vaccine suffice to exempt it from liability under the Vaccine Act.

## DISCUSSION

### 1. Plaintiff's doctors

Plaintiff offers the opinions of three doctors to substantiate her claim that Merck's vaccine caused her condition: David M. Lans, D.O., Carole A. Dorsch, M.D., and Roger E. Wetherbee, M.D.

Dr. Lans' treated Awad for 15–16 months after she received the vaccination (August, 1989 to December, 1990). *See* Affidavit of Dr. David M. Lans, sworn to July 14, 1998, at ¶ 1, attached as Ex. 3 to Plaintiff's Rule 56.1(b) statement and memorandum of law. He states that within a week to ten days after the vaccination, Awad developed an illness "characterized by fever, sore throat, diffuse macula papular rash, and polyarthralgia" (¶ 3). A month after the vaccination, she had "tender and swollen wrists, knees and ankles" (¶ 3). Lans's opinion at the time was that Awad was experiencing severe arthralgia caused by the vaccine (¶ 4). In January, 1990, he opined that she had Rubella arthritis, which would be a self-limiting condition, and he expressed surprise at the extent of her symptoms and disability (¶ 7).

Dr. Lans gives no reason for his conclusion that Awad's condition was caused by the vaccine, other than its temporal proximity to her symptoms, and that after the vaccination Awad exhibited "a high titer anti-Rubella antibody" (¶ 7). He does not state how he ruled out other potential causes of Awad's symptoms. In fact, at various points in his 1998 affidavit and in the letter he attached to it, Dr. Lans states that Awad's condition is "transient" and "self-limiting", that he saw improvement and, that he expected Awad "should be largely recovered within the next couple of months" (¶ 4, 7, Ex. A). In his deposition, Lans states that any arthritis caused by RA 27/3 is supposed to be transient but that Awad's just "didn't go away" (tr. at 110). He also testifies that no objective tests could be done to determine joint pathology (tr. at 110).

Plaintiff continued her medical care with Dr. Dorsch, who has treated her to the present time. Dr. Dorsch states that Awad has "polyarthralgias, most likely resulting from Rubella vaccine and fibro-

myalgia with depression." *See* Affidavit of Dr. Carole A. Dorsch, sworn to July 28, 1998, at ¶ 10, attached as Ex. 2 to Plaintiff's Rule 56.1(b) statement and memorandum of law. She believes that Awad has had other symptoms such as fever and increased lymph nodes, which are "consistent with a Rubella type infection" (¶ 9). However, Dr. Dorsch cites only to the temporal proximity of the vaccination as the reason for her belief that the joint condition was caused by the vaccine (¶ 7). She does not state whether, or how, she ruled out other potential causes.

Dr. Wetherbee did not actually treat Awad. He reviewed her records and read medical literature (some of which was provided to him and some of which he researched himself), the depositions of Drs. White and Stephenson (Merck experts), pre-licensing application documents from Merck, and a survey of post-licensing adverse reaction reports. *See* Affidavit of Roger E. Wetherbee, sworn to July 21, 1998, at ¶ 4, attached as Ex. 5 to Plaintiff's Rule 56.1(b) statement and memorandum of law. He states that within ten days after the vaccination, the hospital records reflect that Awad had a serum sickness, and that although she was negative for the Rubella antibody prior to vaccination, she had a high positive antibody response in blood tests afterwards (¶¶ 7–8). Wetherbee points to a letter from Dr. Aubrey J. Tingle showing Awad's high antibody response (¶ 8). However, Dr. Tingle states in that letter that "[t]hese tests do not rule in or rule out a causative association between rubella vaccine and the clinical course of symptoms you have experienced. At the present time, no definitive laboratory tests exist to establish a cause-effect relationship" (Wetherbee Aff., Ex. B).

Dr. Wetherbee bases his opinion that "in a small number of instances," the RA 27/3 vaccine "most probably does cause chronic arthritis" on "the characteristics of the virus, on the smattering of case reports and of brief studies and impressions." Wetherbee Dep. at 93:11–17. Through his reading, Dr. Wetherbee learned that the virus itself is associated with chronic arthritis, and that certain scientists, including Tingle, say that there is no reason to believe a live vaccine should act differently than the virus (¶¶ 9, 11). To support his opinion that the vaccine caused Awad's symptoms, Wetherbee cites reports including one from the Institute of Medicine ("IOM") stating that "[t]he evidence is consistent with a causal relationship between the currently used rubella vaccine strain (RA 27/3) and chronic arthritis in adult women" (¶ 13, Ex. O) and one from a National Institute of Health meeting expressing a consensus that "a vaccine with a reduced incidence of joint complications in adults was warranted" (¶ 15, Ex. P). Finally, Dr. Wetherbee finds significant the before-and-after temporal relationship between the RA 27/3 vaccine and the symptoms of chronic anthropathy and the absence of alternative explanations (¶ 18).

### 2. The legal standards

To be admissible under Fed. R.Evid. 702, the proffered testimony must (1) be "scientific knowledge" and (2) "assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). The trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*, 509 U.S. at 592–93, 113 S.Ct. at 2796.

Factors to be considered in deciding whether the testimony is "good science" include whether the theory has been tested, whether it has been subjected to peer review and publication, the known or potential rate of error in the scientific technique, the standards controlling the technique's operation, and the general acceptance of the theory or technique in the scientific community. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97.

These factors are not exhaustive. For example, a significant consideration is whether research was conducted independently or for the sole purpose of litigation. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316–17 (9th Cir.1995) ("*Daubert II*").

### 3. The Scientific Materials

#### A. Plaintiff's Experts

(1) Plaintiff relies on Drs. Dorsch and Lans solely for specific causation. However, they point to little to support causation but the temporal relationship between Awad's vaccination and her joint pains, and Awad's high antibody level which Dr. Tingle (who performed the antibody tests) stated did not "rule in or rule out a causative association."

"It is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed.R.Evid. 702." *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119, 1122 (N.D.Ill.1995). *See also Daubert II*, 43 F.3d at 1319 (agreeing with Sixth Circuit's observation regarding testimony of medical expert whose conclusions were based upon timing of ingestion of drug by plaintiffs: "Dr. Palmer offers no tested or testable theory to explain how, from this limited information, he was able to eliminate all other potential causes of birth defects.... Personal opinion, not science, is testifying here."); *Cavallo v. Star Enter.*, 892 F.Supp. 756, 773 (E.D.Va. 1995), *aff'd in relevant part*, 100 F.3d 1150 (4th Cir.1996) (stating that temporal relationship combined with subjective belief that causation is possible "is not the method of science").

(2) Dr. Wetherbee has worked extensively with infectious diseases, and is the Infection Control Officer and Director of the Infection Surveillance Department at New York University Medical Center (Wetherbee Aff., at ¶ 2). He was board certified by the American Board of Internal Medicine in 1974, and in the sub-specialty of infectious diseases in 1997 (¶ 2).

However, Dr. Wetherbee has not published any articles concerning, or conducted any studies on, whether the RA 27/3 vaccine causes chronic and permanent joint problems. Nor has he published articles or conducted studies on the Rubella virus or any Rubella vaccine. His opinion rests primarily on articles written by others, which he analyzed only because of this case.

> One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.

*Daubert II*, 43 F.3d 1311, 1317 (9th Cir. 1995).

Since Dr. Wetherbee has done no studies himself, his own conclusions have not been peer reviewed. However, the theory on which he bases his conclusions—that the RA 27/3 vaccine causes chronic joint problems—has been subjected to peer review, and its degree of acceptance in the scientific community can be examined.

#### B. Plaintiff's treatises

Dr. Wetherbee provides no epidemiological studies which show a causal relationship between RA 27/3 and chronic joint problems, although he points to 13 studies or articles as grounds for concluding there is such a relationship. None of those studies is a large-scale epidemiological study, and most are either immaterial to the issue, anecdotal, or involve either the rubella

virus itself or the earlier HPV–77 vaccine, not RA 27/3.[1]

Plaintiff emphasizes an IOM report entitled "Adverse Effects of Pertussis and Rubella Vaccines" (Christopher P. Howson, et al., eds., National Academy Press 1991) (Ex. O), which according to plaintiff (who does not submit the page containing this conclusion, p. 197) states that "[t]he evidence is consistent with a causal relation between the currently used rubella vaccine strain (RA 27/3) and chronic arthritis in adult women." The report states that some unconfirmed cases of chronic arthritis have been reported to a single institution, but that:

> The current lack of understanding of the natural history and multiple causes of arthritis and the lack of distinction between cases of arthralgia and arthritis in some reports diminish the specificity of the putative association. It is also difficult to establish whether the vaccination truly preceded the adverse event in many cases.

Report at 196.[2]

Plaintiff also relies on Teryl Frey, *Report of an International Meeting on Ru-*

1. Plotkin & Mortimer, Vaccines, 318 (2d ed.) (Ex. C) states a relationship between the virus and the HPV–77 vaccine with arthritis. Aubrey J. Tingle, G.D.M. Kettyls, and Denys K. Ford, *Studies on Vaccine–Induced Rubella Arthritis: Serologic Findings Before and After Immunization,* 22 Arthritis and Rheumatism 400 (1979) (Ex. D) was a small study on the HPV–77 vaccine. Denys K. Ford and Aubrey J. Tingle, *Cell–Mediated Immune Responses in Patients with Recurrent Arthritis Following Rubella Immunization,* 7 J. Rheumatology 225 (1980) (Ex. E) compared six young adult women who experienced arthritis after the HPV–77 vaccine to 20 hospital workers who did not. Aubrey J. Tingle, et al., *Postpartum Rubella Immunization: Association with Development of Prolonged Arthritis, Neurological Sequelae, and Chronic Rubella Viremia,* 152 J. Infectious Diseases 606 (1985) (Ex. F) had no control group. It studied six women who had post vaccine arthritis, and only two of them had received the RA 27/3 vaccine. Aubrey J. Tingle, et al., *Failed Rubella Immunization in Adults: Association with Immunologic and Virological Abnormalities,* 151 J. Infectious Diseases 330 (1985) (Ex. G) is not a study of joint pain; it merely states that one patient had polyarticular arthritis two to three weeks after vaccination. Aubrey J. Tingle, et al., *Rubella-associated arthritis, I. Comparative study of joint manifestations associated with natural rubella infection and RA 27/3 rubella immunization,* 45 Annals of the Rheumatic Diseases 110 (1986) (Ex. H) was not a study of whether RA 27/3 causes chronic joint pain, but shows that both acute and chronic joint pain are far more prevalent after the wild Rubella virus than after vaccination. Denys K. Ford, Aubrey J. Tingle, and Janet K. Chantler, *Rubella Arthritis,* Chapter 14 of Infections in the Rheumatic Diseases (1988) (Ex. I) is simply a chapter of a book that refers to small-scale studies and calls the link between Rubella virus and chronic arthritis a "hypothesis".

Aubrey J. Tingle, et al., *Kinetics of Isotype–Specific Humoral Immunity in Rubella Vaccine–Associated Arthropathy,* 53 Clinical Immunology and Immunopathology S99 (1989 (Ex. J)) did not study the causal relationship between the vaccination and joint problems, but rather looked at each subject's Rubella antibodies before and after vaccination to determine whether some patients were more prone to joint problems than others. J.K. Chantler, D.K. Ford, and A.J. Tingle, *Persistent Rubella Infection and Rubella–Associated Arthritis,* The Lancet 1323 (June 12, 1982) (Ex. K) looked at one woman who had the rubella virus and six women who took the HPV–77 vaccine. Exhibit L, a letter by M.R. Hillerman, does not admit a causal relationship as plaintiff suggests, but merely says that "RA 27/3 gives slightly less arthritis-arthralgia in older women than does HPV–77," and it does not say whether it refers to chronic conditions. Leslie Ann Mitchell, Aubrey J. Tingle, et al., *HLA–DR Class II Associations with Rubella Vaccine–Induced Joint Manifestations,* 177 J. Infectious Diseases 5 (1998) (Ex. U) studies possible genetic predispositions to acute arthropathy of postpartum vaccinated women. Dawei Ou, et al., *Characterization of an Overlapping CD8 and CD4 T-cell Epitope on Rubella Capsid Protein,* 235 Virology 286 (1997) (Ex. V) is not a study of joint complications. It states, without proof of causation, that 5% of vaccinated women get arthritis and 1% of those affected (for a total of 1 in 2000) will get chronic joint problems.

2. In two later reports cited, not by plaintiff, but by Merck, (*Chronic Arthritis after Rubella Vaccination,* 15 Clinical Infectious Diseases 307 (1992)) (Ex. 8) and *Adverse Events Following Pertussis and Rubella Vaccines; Summary of a Report of the Institute of Medicine,* 267 JAMA 392 (1992) (Ex. 10) the IOM stated that "[a]t this time, the relation between ru-

*bella Vaccines and Vaccination, 9 August 1993, Glasgow, United Kingdom*, 170 J. Infectious Diseases 507 (1994) (Ex. P). That report suggests that the possibility of chronic joint pain warranted "vaccine development toward a vaccine with a reduced incidence of joint complications in adults" but when it examined Dr. Tingle's one epidemiological study, it stated that "[t]here was no evidence of a statistically significant difference in the incidence of recurrent or persistent arthropathy among rubella vaccines compared with the placebo group" *Id.* at 507.

## C. Defendant's treatises

Defendant presents two large-scale epidemiological studies, conducted since the IOM reports, tending to show that no risk of chronic joint problems is associated with RA 27/3.

Paula Ray, et al., *Risk of Chronic Arthropathy Among Women After Rubella Vaccination*, 278 JAMA 551 (1997) (defendant's Ex. 4) was a "large retrospective cohort analysis" which evaluated the records of 4884 women and found "no evidence of any increased risk of new onset chronic arthropathies" for women receiving the RA 27/3 vaccine. The Ray study was far larger than any of those cited by plaintiff, and looked for arthropathies, neuropathies, and other conditions including fibromyalgia.

Paul E. Slater, et al., *Absence of an Association Between Rubella Vaccination and Arthritis in Underimmune Postpartum Women*, 13 Vaccine 1529 (1995) (Defendant's Ex. 5) studied 485 vaccinated and 493 unvaccinated postpartum women. Nineteen, or 3.9%, of the vaccinated women, and sixteen, or 3.2%, of the unvaccinated women had arthritis, which according to the study, "was not statistically significant. Thus, we were unable to find evidence of

an association between rubella vaccination of underimmune adult women vaccinated post-partum and the subsequent development of arthritis."

Defendant also presents the one epidemiological study that Dr. Tingle, the main scientist proponent of plaintiff's view, conducted in 1997—Aubrey J. Tingle, et al., *Randomised Double–Blind Placebo–Controlled Study on Adverse Effects of Rubella Immunization in Seronegative Women*, 349 The Lancet 1277 (1997). The study started with 546 women, of whom 232 vaccinated and 224 placebo postpartum women finished the trials. According to the study, the "data reveal only marginally significant differences between treatment groups." *Id.*, at 1280. Both the vaccinated group (22%) and the placebo group (15%) had very high rates of chronic arthralgia or arthritis (against the general U.S. rate of 4.3%, *see* page 1280).

## 4. Conclusions

The Ray, Slater, and Tingle studies are the only three large-scale epidemiological studies presented by either party, and they provide strong evidence that there is no causal relationship between the RA 27/3 vaccine and chronic joint pain. In fact, in a 1997 editorial, Dr. Slater stated that those three "well-designed and well-executed studies should put an end to the fear of major permanent joint disability resulting from administration of rubella vaccine to women." Paul E. Slater, *Chronic Arthropathy After Rubella Vaccination in Women: False Alarm?*, 278 JAMA 594, 595 (1997).

■ In light of those studies, the studies cited by Dr. Wetherbee do not furnish adequate support for his conclusions. "[W]here sound epidemiological studies produce opposite results from nonepidemiological ones, the rate of error of the latter

bella vaccine and chronic arthritis remains unproved" Clinical Infectious Diseases, at 310; that "[t]he evidence did not provide for reliable estimates of excess risk following RA 27/3 immunization" JAMA at 396; and that

"[p]roving that rubella vaccination can cause chronic arthritis will require an understanding of pathogenetic mechanisms and additional well-designed studies" Clinical Infectious Diseases, at 311.

is likely to be quite high." *Raynor v. Merrell Pharms, Inc.,* 104 F.3d 1371, 1375 (D.C.Cir.1997). Plaintiff makes "no serious argument that the epidemiological sample sizes have been too small to detect the relationship" between the RA 27/3 vaccine and chronic joint pain. *Id.* She merely states that the Slater study was funded by Merck and claims, without further explanation or support in the literature, that the Slater and Ray studies "have been criticized by Dr. Tingle and others and both studies are, by their very nature, flawed epidemiological studies" (Pl.'s Br. at 21).

Under the circumstances, the studies Dr. Wetherbee cites "singly or in combination, are not capable of proving causation in human beings in the face of the overwhelming body of contradictory epidemiological evidence." *Raynor,* at 1376, quoting *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823 (D.C.Cir.1988).

In the 20 years that RA 27/3 has been marketed and extensively studied in the United States, not one study has shown a statistically significant causal relationship between the vaccine and chronic joint pain. "[T]he district court can exclude the opinion if the expert fails to identify and defend the reasons that his conclusions are anomalous." *Lust v. Merrell Dow Pharms., Inc.,* 89 F.3d 594, 598 (9th Cir. 1996). As against the large-scale epidemiological Ray, Slater, and Tingle studies, Dr. Wetherbee's hypothesis that RA 27/3 causes chronic arthritis and arthralgia does not represent reliable science, and is rejected pursuant to Fed.R.Evid. 702 and 703. There being no other evidence to show that RA 27/3 can cause the condition Awad complains of, her claim must be dismissed.

Because of the lack of evidence of causation, we need not consider defendant's claim that summary judgment should be granted based on the Vaccine Act.

## CONCLUSION

Defendant's motion for summary judgment is granted. The Clerk shall enter judgment dismissing the complaint, together with costs and disbursements according to law.

So ordered.