**Joseph CANINO and Julia Canino, Plaintiffs,**

v.

**HRP, INC. a/k/a Covance Research Products, Inc.; and Kritter Krates, Inc., Defendants.**

**No. 97–CV–569.**

United States District Court, N.D. New York.

July 27, 2000.

---

Klett Lieber Rooney & Schorling, Philadelphia, PA, (James L. Griffith, of counsel), for Plaintiffs.

Ward, Norris, Heller & Reidy, LLP, Rochester, NY (Kelly A. McCarthy, of counsel), for defendant HRP, Inc. a/k/a Covance Research Products, Inc.

Iseman, Cunningham, Riester & Hyde, LLP, Albany, NY (Michael J. Cunningham, of counsel), for defendant Kritter Krates Inc.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiffs Joseph Canino ("plaintiff") and his wife Julia Canino commenced this ac-

tion for injuries allegedly incurred when plaintiff received a shipment of sixty monkeys in the course of his employment as a lab technician and subsequently contracted a disease known as Herpes B Simian Virus ("HBSV"). Plaintiffs have alleged causes of action against defendant HRP, Inc. a/k/a Covance Research Products, Inc. ("Covance"), which provided the monkeys, sounding in negligence, products liability, breach of warranty, ultra hazardous activity, and negligent breach of federal and state statutory regulations and laws. Plaintiffs also assert a negligence cause of action against Kritter Krates, Inc. ("Kritter Krates"), which transported the monkeys to plaintiff's place of employment. Plaintiffs seek punitive damages from both defendants and have filed a loss of consortium claim on behalf of plaintiff's wife, also requesting punitive damages.

Kritter Krates has joined in Covance's motion to dismiss plaintiffs' complaint in its entirety on grounds that plaintiffs cannot prove causation. Oral argument was held on March 10, 2000 in Utica, New York. Decision was reserved.

## II. *FACTS*

In April 1996, plaintiff was employed as a veterinary technician for Wyeth–Ayers Laboratories, a Division of American Home Products Corporation ("Wyeth"), in New York. Plaintiff's duties included handling animals used by Wyeth for pharmaceutical research. On or about April 11, 1996, Kritter Krates delivered approximately sixty monkeys by truck in crates from the Alice, Texas facility of Covance. The tails on many of the monkeys delivered in this shipment had been amputated before being transported, and as part of his job duties, plaintiff had to evaluate the tail amputations after their arrival in New York. Shortly after delivery, plaintiff prepared to examine one of the monkeys which had a recent tail amputation.

Plaintiff testified that on the date in question, to the best of his recollection he was dressed in protective clothing which included two pairs of plastic booties, a mechanic's thick coverall, a white suit (disposable), two pairs of gloves (duct-taped to the sleeves of his suit), a paper mask (OSHA approved), goggles, hair net and a plastic shield over his face. *See* Griffith Aff. Ex. B; Ex. C at 52–57, 194–204, 238–242. He then entered the primate room with two other individuals employed as animal handlers, in order to conduct the examination.

According to plaintiff's deposition testimony, one of the animal handlers reached into a cage to grab the monkey indicated by plaintiff. At that point the monkey jumped toward the animal handler, and in the process "whipped" its tail (the tail was only partially amputated) against plaintiff's plastic face shield, leaving a small mark of clear fluid on the shield (hereinafter, the "tail-whip incident"). Plaintiff could not recall whether there was also blood on his face shield. *See id.* at 189, 193–94, 204–05. Plaintiff stated that none of the three individuals, himself included, knew whether the monkey's tail had gone below or under plaintiff's face shield—plaintiff was frightened by the monkey's unexpected jump and had shut his eyes. *See id.* at 194, 204, 211–12.

The animal handler then returned the monkey to its cage, and the three individuals inspected one another's clothing for at least one minute. Plaintiff stated that other than the fluid apparent on his shield, he did not recall any blood being noted on his own suit nor that of anyone else. *See id.* at 208–09. Plaintiff further testified that he did not know of any contact by fluid of the monkey with his mucous membranes, nor did he feel any liquid, solid or spray hit his person when the monkey whipped its tail. Plaintiff thought, but was not certain, that he had no exposed skin from the neck up during the encounter with the monkey. *See id.* at 226–27.

Plaintiff then left the room and carefully cleaned his face shield with disinfecting concentrated bleach spray solutions and

disposable biohazard towels until it was in his opinion, clean. He then placed the shield back on and completed the examination. *See id.* at 209–15. In his examination of the monkey's tail, plaintiff observed some fresh blood and pus. Because plaintiff considered this event to be an "incident" rather than an "exposure," he did not report it to Wyeth's occupational health department. *See id.* at 227.

A few weeks later, around or prior to early May 1996, plaintiff began manifesting flu-like symptoms, including headache, cold sweats, shaking uncontrollably and light sensitivity. *See id.* at 59–63. Pursuant to Wyeth company standard procedure, he reported his complaints to an occupational health nurse and was cultured for HBSV. Plaintiff thereafter learned that one of the swabs from a mouth sore had come back positive on a PCR (polymerase chain reaction) test and he should begin anti-viral treatment.[1] *See id.* at 263–64.

The medical histories of two of the monkeys demonstrate that they had tested positive for antibodies to HBSV in July 1995. Both of these monkeys tested negative on two later successive occasions before they were shipped to Wyeth. *See* McCarthy Aff. Ex. B. While plaintiff is not certain that either of those two monkeys was involved in the incident which is the subject of this lawsuit, defendants have agreed that this point may be assumed true for purposes of this motion. Defendants likewise assume as true that at the moment of the tail incident, the involved monkey was "shedding" HBSV, such that it was capable of transmitting the virus to another being. *See* Covance Mem. at 10 n. 2.

In an earlier incident occurring in November 1995, plaintiff's gloved hand was struck with a needle he was using for subcutaneous injections on a monkey. Plaintiff stated in his deposition that he did not believe the needle penetrated his two pairs of gloves, but nevertheless immediately notified his supervisor. He subsequently cleansed the area in accordance with standard procedure. Plaintiff was examined by at least two different doctors following the event. *See* Griffith Aff. Ex. C at 97–99. He experienced a cold or flu in December, the following month, and reported it. However, after some blood work was performed, he experienced no further difficulties. *See id.* at 101–02.

During his approximately two-year tenure at Wyeth, plaintiff's work with monkeys included performing oral gavages, blood draws, subcutaneous injections, administering medication, handling fecal matter from monkeys, and swabbing the eyelids, mouths, and genitalia of monkeys. Plaintiff testified, however, that in the two years prior to the tail-whip incident at Wyeth, plaintiff had never been splashed with any fluids or secretions from monkeys, had not received any monkey bites or scratches, and had not scratched himself on a monkey cage. *See id.* at 94–96.

## III. *DISCUSSION*

### A. *Jurisdiction*

Jurisdiction over this matter is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 and the amount in controversy exceeds $75,000.

### B. *Summary Judgment Standard*

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State*

---

**1.** Defendants have agreed to assume for purposes of this motion that plaintiff actually is infected with HBSV although they claim, based on testimony by their proposed expert witness, that a single PCR test is inconclusive, and false positive results occur with some frequency. *See* Covance Mem. at 12 n. 3; Bernstein Aff. ¶ 21.

*Dep't of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *See Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### C. *Opinions*

#### 1. *Dr. Norman D. Bernstein*

Plaintiffs concede that in order to prevail on each of the causes of action alleged in their complaint, they must prove the element of causation. That is, plaintiffs must prove that the incident complained of on April 11, 1996, actually and proximately caused the injury alleged. In this case, plaintiffs must ultimately establish by a preponderance of the evidence, that plaintiff became infected with HBSV as a result of being exposed to monkey fluids of one of two monkeys that plaintiff argues Covance should not have supplied to Wyeth, in the tail-whip incident described above.

Defendants offer the opinion of Norman D. Bernstein, M.D., F.A.C.P. to meet their initial burden of demonstrating a lack of any triable issue of fact as to causation. Defendants argue that Dr. Bernstein's opinion demonstrates that it is not possible, within a reasonable degree of medical certainty, for plaintiff to have acquired HBSV from the tail-whip incident. Accordingly, defendants submit that plaintiff's action must be dismissed for lack of causation as a matter of law.

Dr. Bernstein is board certified in infectious diseases and treated patients in the Pensacola, Florida cluster of HBSV in 1987. Dr. Bernstein has published articles on issues relating to HBSV and has presented to professional organizations on these topics. *See* Bernstein Aff. ¶¶ 5–12. Prior to offering his opinion, Dr. Bernstein reviewed the portions of plaintiff's deposition testimony in which he describes his protective clothing and those where he describes how the incident occurred. *See id.* ¶ 13.

Dr. Bernstein states in his affidavit that in order for HBSV to spread from animals to humans, "[t]he virus must be present in the secretions, excretions, tissues, blood or body fluid of the monkey or its lab specimen and this material must contaminate a break in the skin, or the mucous membranes of the eyes, nostrils, mouth or tracheobronchus of the human." *Id.* ¶ 18. Further, "intact barrier precautions such as the protective garb worn by the plaintiff, prevent spread of Herpes B Simian virus. Casual exposure such as being in the same room with the Herpes B Simian virus does not result in the spread of the virus." *Id.* ¶ 19.

Accordingly, Dr. Bernstein opined as follows:

> As described above, transmission of this disease requires a mechanical transmission by contact of the virus from the

monkey's body fluids, tissues, secretions or excretions to the exposed surface tissues of the human recipient. There is no evidence here of any such transmission. According to his own testimony, plaintiff had no broken skin and all of his mucous membranes (e.g., nose, mouth, eyes) were covered by several layers of protective equipment (OSHA-approved face mask, safety goggles, plexiglass face shield). There is little, if any, possibility that any trace of monkey fluids possibly containing the virus could have gotten through the multiple layers of protective clothing [plaintiff] was wearing. Therefore, it is my opinion with a reasonable degree of medical certainty, that [plaintiff] did not contract Herpes B Simian virus from the alleged incident he describes involving a monkey's tail. Furthermore, it is my opinion that it would be impossible for any credible, knowledgeable, experienced physician to say with a reasonable degree of medical certainty that, in fact, [plaintiff] did contract Herpes B Simian virus from this alleged exposure. Under these circumstances, it would be pure speculation to say that he did.

*Id.* ¶¶ 33–35.

### 2. *Dr. Vito Iacoviello*

In response to defendants' motion, plaintiffs submitted the opinion of Vito Iacoviello, M.D., an infectious disease physician who has treated plaintiff for his alleged HBSV infection since 1996. Dr. Iacoviello states that, "based on [plaintiff's] description of the tail-whip incident, as well as the known and unexplained modes of transmission of herpes B from monkeys to humans, it is my opinion, to a reasonable degree of medical certainty, that plaintiff could have, and likely did, contract Herpes B Simian Virus during the tail whip incident." Iacoviello Aff. ¶ 20.

First, Dr. Iacoviello notes that there have only been forty to fifty documented cases of HBSV in humans in the past fifty years, apparently suggesting that the means of transmission are not necessarily well-established. Dr. Iacoviello cites one example of a case where an individual had Herpes B meningitis but the infectious contact with monkeys was not identified. *See id.* ¶ 8. While not disputing that the types of transmission described by Dr. Bernstein are most common (monkey bite, scratch or contaminating needle), Dr. Iacoviello contends that other means include "being splashed with infected monkey fluids, causing the infectious material to enter the mucous membranes of the mouth, eyes, nostrils, gut or break in skin of the human." *See id.* ¶ 9. Because the smallest possible infectious innoculum is not known, microscopic amounts of infectious fluids from a monkey may be adequate to transmit infection to a human— such that the human would not feel or see the contaminating material. *See id.* ¶¶ 10–11. Dr. Iacoviello thereby suggests that plaintiff would not necessarily have seen or felt the contamination in this instance. *See id.* ¶¶ 14–16.

Second, Dr. Iacoviello focuses on plaintiff's testimony that during his approximately two-year tenure at Wyeth prior to the tail whip incident, plaintiff had never been splashed with monkey fluids, and was never bitten or scratched. *See id.* ¶ 13. Dr. Iacoviello also states that the protective gear that plaintiff claims to have been wearing at the time of the incident is not 100% effective against the risk of infection. *See id.* ¶ 17.

In his deposition testimony, Dr. Iacoviello ruled out the needle incident as a possible source of plaintiff's HBSV because the monkey involved in that incident did not test positively for HBSV, nor did plaintiff. McCarthy Aff. Ex. F at 44–45, 294, 313. Dr. Iacoviello also acknowledged that it was possible for plaintiff to have been exposed to HBSV at a time other than the tail whip incident, given that he worked with monkeys on a daily basis. Nevertheless, he concluded that exposure at other times was much less likely than the tail-whip incident given the more "dramatic"

nature of the latter, as well as the rarity of cases of transmission to humans. That is, Dr. Iacoviello suggested that because there are so few reported cases of HBSV in humans, the virus is likely not transmitted easily or casually. In addition, infection is a factor of exposure over time. Dr. Iacoviello thus explained that a more dramatic event such as the tail-whip incident may be associated with a higher level of exposure than the normal routine situations of plaintiff's daily activities. *See id.* at 271, 278–79, 286–89.

## D. *Admissibility of Dr. Iacoviello's Opinion*

Defendants argue that their motion should be granted notwithstanding Dr. Iacoviello's affidavit because his opinion is not admissible, and without it, plaintiff cannot prevail. Defendants claim that: (1) Dr. Iacoviello is not qualified to serve as an expert on the subject of the transmission of HBSV; and (2) even if qualified, his opinions should not be admissible pursuant to Rule 702 of the Federal Rules of Evidence ("Rule 702").

■ The Supreme Court established the standard for the admissibility of expert testimony under Rule 702 in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that a witness qualified as an expert may give opinion testimony relating to "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Under *Daubert,* the Court held that evaluating admissibility pursuant to Rule 702 "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. The trial court is thus vested with the role of "gatekeeper," ensuring that any scientific testimony admit-

ted is both reliable and relevant. *See id.* at 589, 597, 113 S.Ct. 2786.

### 1. *Qualifications*

■ Initially, it must be determined whether Dr. Iacoviello properly qualifies as an expert pursuant to Rule 702.

■ Rule 702 permits opinion testimony from "a witness qualified as an expert by knowledge, skill, experience, training or education." As noted in *Zwillinger v. Garfield Slope Housing Corp.,* No. CV 94–4009, 1998 WL 623589, at*9 (E.D.N.Y. Aug. 17, 1998), "[t]he Second Circuit has construed expert qualification requirements liberally." Indeed, "[l]iberality and flexibility in evaluating qualifications should be the rule ... the expert should not be required to satisfy an overly narrow test of his own qualifications." *Bunt v. Altec Indus., Inc.,* 962 F.Supp. 313, 317 (N.D.N.Y.1997) (*quoting Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 226, *aff'd,* 101 F.3d 682 (2d Cir.1996)). Accordingly, assuming that the proffered expert has the requisite minimal education and experience in a relevant field (*Zwillinger,* 1998 WL 623589 at *7), courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit. *See id.* at *8 (*citing In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 741 (3d Cir.1994)); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995) (rejecting argument that doctor had to be specialist in environmental medicine in order to provide testimony on whether glue fumes caused plaintiff's throat ailments as "an unwarranted extension of the gatekeeper role announced in *Daubert.*"). The expert may not, however, offer an opinion on a different field or discipline. *Bunt,* 962 F.Supp. at 317.

Dr. Iacoviello has been treating plaintiff for HBSV since 1996. Dr. Iacoviello's curriculum vitae indicates that he is a physician board certified in infectious diseases since 1992, a member of numerous societ-

**28**

ies involving infectious diseases, and an instructor in medicine who has made presentations to his peers on topics involving infectious diseases, primarily HIV. Dr. Iacoviello also testified as to his special training in infectious diseases, noting that he was both a clinical and research fellow in that area, and that his training included acquiring knowledge in diagnosing HBSV. *See* McCarthy Aff. Ex. F at 13. Dr. Iacoviello's practical experience has included thousands of infectious disease consultations. *See id.* at 18–19. Further, in treating plaintiff, Dr. Iacoviello consulted with two doctors distinguished in the field of infectious diseases and having specialized knowledge of, and extensive experience with, HBSV. *See id.* at 23, 38, 34–36, 82, 156.

Here defendants have not protested Dr. Iacoviello's qualifications on the basis of inadequate education, training or experience in infectious diseases. Rather, Covance argues only that Dr. Iacoviello should not be classified as an expert because he has little experience diagnosing or treating patients with HBSV. As outlined above, however, courts have not required such narrowly tailored specialization in assessing an individual's qualifications to testify as an expert. *See McCullock*, 61 F.3d at 1043; *Zwillinger*, 1998 WL 623589, at *8. HBSV is an infectious disease, and consequently, broadly within the realm of Dr. Iacoviello's field of expertise for which he has had significant clinical experience. His additional experience with HBSV (including treatment of plaintiff) is detailed above. Dr. Iacoviello does not, in his submitted affidavit, opine on a field other than that in which he was trained.

■ On a similar note, the fact that Dr. Iacoviello conceded in the course of his deposition that he lacked knowledge as to

certain specific properties of HBSV, such as how long it can survive outside the monkey, and the smallest amount of fluid needed to infect a human, does not render him unqualified. The Second Circuit has held that "quibble" with proposed expert's training or knowledge on specific points may properly be explored on cross-examination at trial and thus go to the weight and credibility of the expert's testimony, not admissibility. *See McCullock*, 61 F.3d at 1043–44.

In sum, Dr. Iacoviello's training and experience renders him sufficiently qualified as an expert to offer his opinion regarding the transmission of HBSV to plaintiff.[2]

### 2. *Testimony*

Having determined that Dr. Iacoviello is qualified to testify as an expert, the next "gatekeeping" inquiry is whether the proposed testimony will involve (1) scientific knowledge that (2) will assist the trier of fact to understand the evidence or determine a fact in issue. *See* Fed.R.Evid. 702; *Bunt*, 962 F.Supp. at 317. As there appears to be no question of the relevancy of Dr. Iacoviello's testimony, the Court will focus solely on whether his opinion constitutes scientific knowledge.

■ Significantly, the Court's role as gatekeeper is "tempered by the liberal thrust of the Federal Rules of Evidence and the 'presumption of admissibility.'" *Bunt*, 962 F.Supp. at 317 (*citing Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995)). Accordingly, "[d]oubts about the usefulness of an expert's testimony, should be resolved in favor of admissibility." *Marmol v. Biro Mfg. Co.*, No. 93 CV 2659(SJ), 1997 WL 88854, at *4 (E.D.N.Y. Feb. 24, 1997).

In the *Daubert* opinion, the Supreme Court set forth certain factors which may be considered relevant in the preliminary

---

**2.** Notably, Dr. Bernstein himself compared the transmission of HBSV to that of HIV or human Herpes Simplex Virus (Bernstein Aff. ¶ 19), thereby indicating that knowledge of a broader class of viruses is useful in determining whether plaintiff was infected with HBSV from the tail whip incident.

determination of whether a proposed theory constitutes scientific knowledge for purposes of Rule 702, including whether the theory: (1) can be, and has been, tested; (2) has been subjected to peer review and publication; and (3) has received general acceptance in the relevant scientific community.[3] *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. Nevertheless, the Supreme Court stated that "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one." *Id.* at 594, 113 S.Ct. 2786. Accordingly, in offering the various factors for consideration, the Court did "not presume to set out a definitive checklist or test." *Id.* at 593, 113 S.Ct. 2786; *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."). Moreover, a question has been raised by some courts as to whether the *Daubert* test even applies where the expert testimony is based upon experience or training, rather than methodology or technique. *Bunt,* 962 F.Supp. at 317 n. 3; *see also Becker v. National Health Prods., Inc.,* 896 F.Supp. 100, 103 (N.D.N.Y.1995) (lack of peer review or publication irrelevant in light of expert's experience as physician). The Daubert Court itself recognized that theories which are "too particular, too new or of too limited interest" may not be published. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786.

In its reply memorandum of law, Covance incorrectly characterizes the factors cited in *Daubert* as requirements. As explained above, those factors are neither mandatory nor exclusive—particularly since Dr. Iacoviello's qualifications are primarily based upon his training, experience with infectious diseases, and treatment of plaintiff. Accordingly, Dr. Iacoviello's testimony should not be precluded based on the *Daubert* factors.

Significantly, in the present case, Dr. Iacoviello and Dr. Bernstein are in agreement that in order to spread, HBSV "must be present in the secretions, excretions, tissues, blood or body fluid of the monkey or its lab specimen, and this material must contaminate a break in the skin, or the mucous membranes of the eyes, nostrils, mouth or tracheobronchus of the human." Bernstein Aff. ¶ 18; *and see* Iacoviello Aff. ¶ 9. Contrary to Dr. Bernstein, however, Dr. Iacoviello believes that this theory supports the likelihood that plaintiff became infected with HBSV during the tail-whip incident, notwithstanding his protective garb and the fact that he did not see or feel any monkey fluids on his person at the time. Dr. Iacoviello suggests that plaintiff was splashed with a small, even microscopic, amount which he did not notice. Dr. Iacoviello also offers that transmission may have occurred while plaintiff was cleaning his face shield, for example if he rubbed his eye, nose or mouth.

Covance attempts to demonstrate that Dr. Iacoviello's opinion is speculative by exhaustively quoting from his deposition testimony each instance wherein Dr. Iacoviello utters the words "I don't know" or says his answer would be speculative. However, these responses typically follow questions like, "But in fact did [plaintiff] rub infectious material from the monkey into his eye?" *See* Covance Reply Mem. at 7–8. Clearly such questions do not bear on the reliability of Dr. Iacoviello's scientific opinions, but rather are questions more properly directed at an eye witness to the tail-whip incident, which Dr. Iacoviello does not purport to be. The Court is therefore not persuaded by Covance's argument that Dr. Iacoviello's opinion constitutes pure speculation based on the quotations recited by Covance.

Covance next argues that Dr. Iacoviello's testimony is overly dependent on the temporal proximity between the tail-whip

---

**3.** The Supreme Court also included as a factor the known or potential rate of error in a given scientific technique. *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786. Here however, no special technique has been presented.

incident and plaintiff's onset of HBSV. Covance cites *Awad v. Merck & Co.*, 1999 WL 681389, No. 95 Civ. 8779(LLS) (S.D.N.Y. Aug. 31, 1999), for the legal principle that "a causation opinion based solely on a temporal relationship is not derived from the scientific and is therefore insufficient to satisfy the requirements of Fed.R.Evid. 702." In that case, the plaintiff attempted to argue that her permanent arthritis and arthralgia was caused by a rubella vaccination, and her expert failed to state how he ruled out other causes of plaintiff's condition. Here, in contrast, Dr. Iacoviello does not rely solely on the proximity in time between the tail-whip incident and plaintiff's HBSV symptoms. Rather, Dr. Iacoviello testified that his conclusion was also based upon the greater risk of exposure created by the tail-whip incident as compared to plaintiff's routine interaction with monkeys on other days. In addition, he ruled out the needle-stick incident because that monkey did not test positive for HBSV.

Moreover, in *Awad*, there was no evidence that a rubella vaccine was capable of causing chronic arthritis. In the present situation the causation issue is different: there is no dispute that contact through a person's mucous membranes or break in the skin with the blood or fluids of a monkey may cause a person to become infected with HBSV. The only question here is the nature of the infecting episode, i.e., whether the tail-whip incident was its source. Here the tail-whip monkey was, in fact, infected with HBSV and actively "shedding" such that it was capable of transmitting the virus. Under these circumstances, Dr. Iacoviello's consideration of temporal proximity in conjunction with other risk factors does not appear to be "junk" science of the sort that the *Daubert* principles are designed to protect against.

The case of *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316 (7th Cir.1996)—where the Seventh Circuit upheld the lower court's decision not to admit the testimony of the plaintiff's expert—is similarly distinguish-able. In *Rosen*, plaintiff's expert, a cardiologist, was unable to adequately demonstrate that a nicotine patch worn for three days by a smoker could cause a heart attack. The court in *Rosen* also pointed out that the doctor's testimony failed to recognize effects of smoking, fatty diet, high blood pressure, diabetes "and other well-known causal factors in coronary artery disease and hence in heart attacks." *Id.* at 319. For these reasons, the court considered the expert's testimony in the realm of "scientific guesswork," even if inspired. *Id.* Here, again, the situation is not analogous because the cause is not in dispute: the experts agree that HBSV is caused by an exposure to infected monkey fluids. Rather, it is the precipitating event of plaintiff's HBSV that is the point of contention. In addition, Dr. Iacoviello considered other possible sources but ruled them out based on risk assessment and scientific principles regarding the spread of infectious diseases.

██ Notably, Covance argues that Dr. Iacoviello's reasoning is flawed because he failed to rule out alternative causes of plaintiff's HBSV such as "the very real possibility that [plaintiff] could have been exposed at some other time and did not know it," adding that Dr. Iacoviello "acknowledged that the medical literature contains at least one report of a person with HBSV who could recall no exposure." Covance Reply Mem. at 24. This point, however, undermines the opinion espoused by Dr. Bernstein and theoretically supports Dr. Iacoviello's theory of transmission by microscopic amounts. Moreover, Dr. Iacoviello was not required to rule out all other possible causes for his opinion to be admissible, particularly where it is clear that he gave consideration to such other causes. *See In re Paoli*, 35 F.3d at 764. Dr. Iacoviello's risk analysis clearly included consideration of the possibility of exposure unbeknownst to plaintiff, as he specifically determined that plaintiff's exposure likely occurred during the tail-whip incident rather than during a less "dramatic"

performance of his routine duties. *See* McCarthy Aff. Ex. F at 278–79, 286–89.

■ Dr. Iacoviello's opinion is apparently based on years of education, training and clinical experience in the field of infectious diseases as well as his specific treatment of plaintiff. Moreover, he relies on the scientific principle that infection is a factor of exposure over time (*see id.* at 286–288) and a methodology of risk analysis commonly used by infectious disease physicians (*see id.* at 43). Finally, he does not dispute Dr. Bernstein's theory of virus transmission through mucous membranes or openings in the skin, but merely formulates a different conclusion from the facts. Dr. Iacoviello's opinion is not "scientifically unreliable" merely because it is at odds with that offered by Dr. Bernstein. Rather, under the circumstances of this case, Dr. Iacoviello's opinion constitutes scientific knowledge which may be admissible as expert testimony. *See Bunt,* 962 F.Supp. at 318; *Becker,* 896 F.Supp. at 103.

It bears reminding that notwithstanding the fact that Dr. Iacoviello's testimony is admissible, appropriate safeguards remain in place by which defendants may attack Dr. Iacoviello's testimony. As the Supreme Court stated in *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786; *see also McCullock,* 61 F.3d at 1044 ("[d]isputes as to the strength of the [the expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *Marmol,* 1997 WL 88854, at *6 ("While defendant may ultimately be correct that [the expert's] opinions should not be accorded much weight, it is an entirely different matter from the issue of whether plaintiff should be deprived of the opportunity to present such testimony."); *Bunt,* 962 F.Supp. at 318.

■ For purposes of this motion, defendants have conceded that plaintiff is infected with HBSV, and that the tail-whip monkey was infected with HBSV and actively "shedding" such that it was capable of transmitting the virus on the date in question. Considering these facts along with both Dr. Bernstein and Dr. Iacoviello's causation testimony, and construing all inferences in favor of plaintiff, the non-movant, the plaintiff has raised sufficient factual issues to warrant a trial before a jury.

## IV. *CONCLUSION*

The Court finds that both Dr. Bernstein and Dr. Iacoviello properly qualify as expert witnesses. Because Dr. Iacoviello's causation testimony is admissible pursuant to Rule 702, plaintiff has succeeded in raising factual questions in opposition to the causation testimony offered by Dr. Bernstein, which is likewise admissible, such that a genuine issue of material fact exists which must be resolved at trial.

Accordingly, it is

ORDERED that the motion for summary judgment made by HRP, Inc., a/k/a Covance Research Products, Inc., and Kritter Krates, Inc. is DENIED.

IT IS SO ORDERED.